# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONALD E. POLK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-1074-BWD |
| | ) | |
| DENNIS R. STEWART and JOYCE A. STEWART, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 20, 2024
Date Decided: January 8, 2025

Dean Campbell, LAW OFFICE OF DEAN A. CAMPBELL, P.A., Milton, Delaware; *Attorneys for Plaintiff Donald E. Polk, Jr.*

David C. Zerbato and Caren L. Sydnor, MORTON, VALIHURA & ZERBATO, LLC; *Attorneys for Defendants Dennis R. Stewart and Joyce A. Stewart.*

**DAVID, V.C.**

Through this action, plaintiff Donald E. Polk, Jr. ("Plaintiff") seeks specific performance of a land installment contract through which he agreed to purchase, and defendants Dennis R. Stewart and Joyce A. Stewart ("Defendants") agreed to sell, real property in Millsboro, Delaware. For reasons explained below, Plaintiff's request for specific performance is denied and judgment is entered for Defendants.

## I. BACKGROUND

The following facts are drawn from factual stipulations in the parties' Pre-Trial Stipulation and Order and the evidence presented at a one-day trial held on July 9, 2024.[1]

### A. Plaintiff And Defendants Execute An Installment Contract.

This action concerns real property located at 32751 Spring Water Drive in Millsboro, Delaware (the "Property").[2] Plaintiff and his former wife began renting the Property from Defendants in February 2010.[3] Plaintiff and his wife divorced, and in early 2015, Mr. Stewart informed Plaintiff that Defendants planned to retire and wished to sell the Property.[4] Plaintiff expressed an interest in purchasing the

---

[1] The Pre-Trial Stipulation and Order is cited as "PTS ¶ __." Trial testimony is cited as "Tr. (Witness) at __." Although the parties labeled some exhibits as "JX" and others as "PX" or "DX," for consistency, all trial exhibits are cited as "JX __."

[2] JX 1 ¶ 1.

[3] *See* Tr. (Polk) at 6.

[4] *Id.* at 7.

Property, but knew he could not obtain financing because his credit was impaired as a result of the divorce.[5] Because Plaintiff otherwise would not have been able to purchase the Property, Defendants offered to allow Plaintiff to purchase the Property in installments over a five-year period.[6]

On June 19, 2015, Plaintiff and Defendants entered into an Installment Land Sales Contract (the "Installment Contract") under which Plaintiff agreed to purchase, and Defendants agreed to sell, the Property in installments for a total purchase price of $303,000.00, plus interest.[7] The Installment Contract required Plaintiff to make an initial payment of $1,900.00 on July 1, 2015, and then to pay monthly installments of $1,900.00[8] over five years, with the unpaid balance and accrued interest due in five years—by June 30, 2020.[9] The Installment Contract also stated that the

---

[5] *Id.*

[6] *Id.* at 9.

[7] PTS § 3, ¶ 1; JX 1 ¶ 2.

[8] At trial, Plaintiff testified that the $1,900.00 per month installment payment was an error, and that the parties instead intended to include a monthly installment payment of $1,700.00. *See* Tr. (Polk) at 10. Because Paragraph 2 of the Installment Contract references "monthly installments of $1,900.00 ($438.46 per week)[,]" Plaintiff argued that "if you take the $438.46 and times it by four, it comes up to . . . $1,753[,]" which is closer to $1,700.00 than $1,900.00. *Id.* at 11; *see* JX 1 ¶ 2. Plaintiff's calculation, however, does not account for months with five weeks. A weekly payment of $438.46 multiplied by fifty-two weeks in a year supports a $1,900.00 monthly payment. Mr. Stewart also testified, credibly, that the parties never discussed or agreed to a $1,700.00 installment payment. Tr. (Stewart) at 121.

[9] JX 1 ¶ 2.

Defendants "shall extend for a period of six (6) months the payment of the remaining principal balance if requested to do so by [Plaintiff]."[10]

The Installment Contract stated that "[t]he periodic rental value of the property shall be equal to $1,425.00" and "[i]n the event of [Plaintiffs]'s default the monthly rental value shall be non-refundable but all other sums paid (i.e. principal payments) shall be considered as down payments to the principal amount due."[11]

The Installment Contract further stated that "[i]n the event of [Plaintiff]'s default for failure to pay, the [Plaintiff] shall still have the right to redeem the property by making full payment of the remaining contract amount within 120 days of the [Defendants] providing written notice of the default."[12] However, it also provided that:

> If [Plaintiff] fails to redeem the property by making full payment within 120 days, this contract shall convert by law to a landlord agreement after the default, wherein rent shall be the rental value established in paragraph 4 and all payments in excess of that amount shall be first credited to costs of repair, then to arrears in rent, and any amounts remaining in excess of that allowable by 25 *Del. C.* § 5514 shall be paid to the [Plaintiff].[13]

---

[10] *Id.*

[11] *Id.* ¶ 4.

[12] *Id.*

[13] *Id.* ¶ 5.

## B. The Parties Extend The Installment Contract.

Over the next five years, Plaintiff was short or late on installment payments nearly every month.[14] Nevertheless, on January 1, 2019, Mr. Stewart told Plaintiff in an email that Plaintiff "ha[d] done a great job in making payments on [their] Installment Land Agreement."[15] Mr. Stewart explained, however, that due to health problems, Defendants would not "be able to renew the contract" after it expired in eighteen months.[16] Mr. Stewart told Plaintiff that "[i]f you want to include your mom that is ok by me" and "I will do whatever I can to help you secure a mortgage."[17]

Unbeknownst to Defendants, and in breach of the Installment Contract,[18] in August 2019, Plaintiff began subleasing the Property on Airbnb.[19] During that time,

---

[14] *See* JX 15; JX 16; Tr. (Polk) at 15 ("I told Mr. Stewart, when I went through my divorce, it hit me pretty hard. And when I made payments to Mr. Stewart, I didn't always make the [$]1700[.00] on the first of the month. I would pay things weekly. I would pay things throughout the month. And if I could pay more, I would pay more. If I was short, I would pay extra that way.").

[15] JX 9.

[16] *Id.*

[17] *Id.*

[18] *See* JX 1 ¶ 17.

[19] JX 21; Tr. (Polk) at 85.

Plaintiff continued to be late and short on rental payments,[20] despite receiving at least $1,600.00 per month from renters.[21]

On September 8, 2019, Mr. Stewart wrote Plaintiff an email asking when Plaintiff would be sending his August installment payment and whether he had "thought about having [Plaintiff's] mother as a co[-]signer[.]"[22]  As the June 2020 closing date approached, Mr. Stewart stated that he "would be willing to go a few more months but . . . would like to settle by the end of October 2020."[23]

On August 15, 2020, Defendants provided Plaintiff with an amended Installment Contract (the "Amendment"), which Plaintiff executed on September 19, 2020.[24]  The Amendment extended the Installment Contract through December 31, 2020, and stated that "[t]he amortization schedule reflects a principal balance of $272,500 as of December 31, 2020, but [Defendants] will reduce the principal to $260,000, which is a $12,500 discount, if settlement occurs by December 31,

---

[20] *See* Tr. (J. Motsco) at 168 ("[E]very single month the payment was short.  So [Mr. Stewart] had to take from his savings in order to, you know, pay the rest of the mortgage.").

[21] *See* JX 16; Tr. (Polk) at 85 ("I don't think [the Airbnb rent] was [$]16 [hundred].  I think it might have been more.").

[22] JX 8.

[23] *Id.*

[24] Tr. (Polk) at 64; JX 3.

2020."[25]  In exchange, the Amendment required Plaintiff to "either . . . settle or vacate [the Property] by December 31, 2020."[26]

### C.   Defendants Reject Donna's Offer To Purchase The Property.

At trial, Plaintiff testified that in October 2020, his sister, Donna, agreed to loan him the funds to purchase the Property.[27]  That was not true.  When asked whether Donna would have written Plaintiff a check for the purchase price, she testified that she "wouldn't have done that" but "was qualified to purchase the home" herself.[28]  Donna further explained that she "was getting a loan to purchase the property[,]" and she "would have to pay the loan, but it would be in conjunction with [Plaintiff] really assuming responsibility for the property."[29]  In other words, the "loan would be in [Donna's] name" and Plaintiff would "giv[e] the money to [her] to make sure that [she was] paying it because it[] [would be] in [her] name."[30]

On November 13, 2020, Plaintiff texted Mr. Stewart, inquiring about the square footage of the Property.[31]  The same day, Mr. Stewart responded with the

---

[25] JX 3 ¶ 1.

[26] *Id.* ¶ 3.

[27] *See* Tr. (Polk) at 22; *id.* at 28.

[28] *Id.* (D. Polk) at 113.

[29] *Id.* at 107.

[30] *Id.* at 108.

[31] JX 6.

square footage.[32]  On November 27, Mr. Stewart asked if Plaintiff had mailed a check for the balance of the September installment payment, explaining that "[i]f we close in December I will consider waiving the Oct and Nov payments which are past due."[33]  Plaintiff responded that he would "mail Monday[,]"[34] but never made another installment payment.[35]

On November 28, Mr. Stewart texted Plaintiff, asking him to "please be honest with" him about whether the parties would "have a settlement in December[,]" and requesting information about Plaintiff's loan provider.[36]  On December 1, Mr. Stewart again asked to "know [Plaintiff's] status" and whether Plaintiff had "mail[ed] a check[,]" but Plaintiff did not respond.[37]

The next day, Plaintiff informed Mr. Stewart that his sister Donna would be securing financing to purchase the Property.[38]  Mr. Stewart responded that he was not willing to sell the Property at the Installment Contract price to anyone but

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *See* Tr. (Polk) at 39 ("I didn't pay November nor December because I'm thinking we're transitioning into me giving him the money for the property."); *id.* at 45 ("I made my last payment, partial payment of October.").

[36] JX 6.

[37] *Id.*

[38] *See id.*; Tr. (Stewart) at 132 ("Donald mentioned to me that his sister could buy the house. And I told Donald that, you know, she's not on the contract . . . ."); *id.* at 133–34.

7

Plaintiff, but that he was willing to sell the Property to another buyer for $279,000.00:

> In our contract[,] if you cannot buy the house[,] then the contract turns into a rental contract. After you move out[,] we are responsible for getting [the] house ready to go on [the] market. The price we were going to list the property is $290,000. I am calculating that the money that would be returned to you would be in the $10,000 range after repair costs and deducting the non[-]payment of Oct, Nov and Dec 2020 which totals about $5,500. To sell the house to someone other th[a]n you at $260,000[,] I would waive the Oct, Nov, Dec payments and pay you $4,500 when we settle with buyer. This would total $10,000. If you agree we will get [a] document prepared indicating this. Otherwise[,] you will need to vacate the house by 12/31/2020 and wait for [the] house to be sold[,] then you would get your money. If I would have know[n] about buyer[,] I would have told you that [for] anyone other th[a]n you[,] the price is $279,000.[39]

Donna did not agree to purchase the Property for $279,000.00 at that time.

### D.   Plaintiff Informs Defendants He Cannot Settle On The Property.

On December 3, 2020, Mr. Stewart told Plaintiff that his daughter, Jeanene Motsco, would be "handling . . . this situation" because Mr. Stewart had become "to[o] sick to handle it" anymore.[40]

---

[39] JX 6.

[40] *Id.*; *see also* Tr. (J. Motsco) at 167 (Jeanene Motsco explaining that she became involved in discussions with Plaintiff because her "mom had a stroke back in 2019, which left her unable to speak . . . she needed care 24/7. And my dad was taking care of her, trying to manage day-to-day things, and it was just becoming too much. He became sick as well").

On December 5, Ms. Motsco; her husband, Jeffrey Motsco; and Plaintiff spoke on the telephone.[41] The Motscos each credibly testified that on that call, Plaintiff stated "point-blank" that he had "no intention" of settling on the Property,[42] and the three discussed the date that Plaintiff would vacate the Property.[43] Consistent with that discussion, on December 16, Ms. Motsco sent Plaintiff a draft "Moveout Agreement"[44] that stated:

1.  Date to vacate will move from December 31, 2020 to January 10, 2021 with a pro-rated payment of $633 being due for January 1, 2021 to January 10, 2021.

2.  All other past payments will be due including any late fees.

3.  House is returned with keys, pool passes, and in the same condition as when you moved in except for normal wear and tear to paint and carpet—including, but not limited to having been thoroughly cleaned and all personal property completely removed by the above date.[45]

---

[41] *Id.* at 170–71; *id.* (Jeffrey Motsco) at 190–91.

[42] *Id.* (J. Motsco) at 170; *see also id.* (Jeffrey Motsco) at 191 ("During that phone call we had asked if he had any intention to settle or the ability to settle. And he said, no, I do not have any ability or intention to settle—by the December 31st deadline, that is.").

[43] *Id.* (J. Motsco) at 170–71; *id.* (Jeffrey Motsco) at 191.

[44] JX 4; JX 5.

[45] JX 4 ¶¶ 1–3.

Ms. Motsco followed up with Plaintiff on December 21, but Plaintiff did not respond.[46] On December 23, Mr. Stewart texted Plaintiff, asking Plaintiff to call him or Ms. Motsco because they "need[ed] to know what [Plaintiff] [was] doing!"[47]

The next day, Mr. Stewart texted Plaintiff again, explaining:

Donald. As you can see[,] I am not sleeping at night and I am struggling to take care of my wife as well as myself. This is why I asked [Jeanene] to work with you. I think you would agree that I have been fair with you and tried to work with you on the house. Please don't make it difficult for me now. You are a good honest person so please don't let me think otherwise. Thank you! . . . We look forward to talking to you and getting everything resolved.[48]

Plaintiff responded that he was "not signing [Defendants'] daughter[']s contract[,]" and would "be sending [Defendants] a check[,]" but "[g]etting out at the end of the month w[ould] not happen to have the place clean and ready for [Defendants]."[49] Mr. Stewart asked if Plaintiff would move out on January 10 and if there was something he could "do other than extend the vacate date to Jan. 10?"[50]

On December 26, Mr. Stewart and Plaintiff spoke on the phone, during which Plaintiff again stated that he did not intend to settle on the Property by December

---

[46] JX 5.

[47] JX 6.

[48] *Id.*

[49] *Id.*

[50] *Id.*

31.[51] On December 17, Plaintiff texted Mr. Stewart, "[w]hen the house is sold, how much money will I get?"[52] Mr. Stewart responded, "[r]ight now I cannot tell you how much. I will however make sure everything is documented for you."[53]

### E. Plaintiff Informs Defendants He May Be Able To Settle On The Property.

While Defendants were urging Plaintiff to agree to a plan to vacate the Property, his sister Donna continued pursuing a mortgage to purchase the Property.[54]

On December 28, 2020, Plaintiff texted Mr. Stewart that he had "just left from the mortgage company" and thought he would "be approved."[55] Although Plaintiff told Mr. Stewart that *Plaintiff* had found a lender, that was not true. *Donna* applied for a mortgage to purchase the Property on December 21, despite Defendants declining to sell the Property to her earlier that month.[56] As reflected in a pre-qualification letter received months later, Plaintiff was not included on Donna's mortgage paperwork; her mortgage approval was conditioned on a "signed contract

---

[51] *See id.*; Tr. (Stewart) at 137.

[52] JX 6.

[53] *Id.*

[54] *See* JX 11 (email from SECU mortgage loan officer to Donna Polk asking to review her loan application); Tr. (Polk) at 23–24 (admitting Plaintiff did not inform Defendants of his efforts to obtain financing through his sister Donna).

[55] JX 6.

[56] *See id.*; JX 11.

of sale"; and her "[q]ualification was based on the purchase of a[n] *Owner Occupied PUD Detached.*"[57]  *Plaintiff* was not approved for a mortgage.[58]

In any event, Mr. Stewart told Plaintiff the same day that Plaintiff "previously expressed the inability to settle by the end of the year, which is this Thursday.  Per our discussion Saturday, we expect you to be out of the house by January 10, 2021."[59]  Plaintiff responded, "I didn't think we would be having any issues. Because I was turned down with one lender doesn't mean I would stop looking. Now that I have found one[,] I didn't think it would be a problem."[60]  Mr. Stewart then explained,

> Per our agreement you signed in September, we gave you the option to settle by December 31, 2020.  Our subsequent conversations confirmed that you could not settle by Thursday.  For your convenience only, we agreed to allow you to finish moving out by January 10, 2021.  At this time, we do not have an agreement to sell the house to you.  We expect you to vacate the house by January 10, 2021.  I understand you are concerned about getting money back after we sell the house.  At this time[,] we don't have an exact figure but will document everything and provide it to you as soon as it's available.[61]

---

[57] *See* JX 13 (emphasis added).

[58] Plaintiff did obtain a pre-qualification financing letter from a bank years later, on September 25, 2023.  *See* JX 12.

[59] JX 6.

[60] *Id.*

[61] *Id.*

12

Plaintiff claims that after receiving this communication, both he and Donna ceased efforts to obtain financing.[62]

**F.** **Defendants Discover Plaintiff Has Been Sub-Leasing The Property And Again Reject Donna's Offer To Purchase The Property.**

In early January 2021, Defendants visited the Property to collect Plaintiff's keys.[63] When they arrived, they discovered that Plaintiff was not occupying the Property, but, instead, had been subleasing it in violation of the Installment Contract.[64]

On February 27, 2021, Ms. Motsco texted Plaintiff that Defendants had turned the matter over to their attorneys and requested that Plaintiff's renters vacate the Property by March 1.[65] Plaintiff responded that he would not be returning the keys to the Property by March 1.[66] Ms. Motsco reminded him that if he did not vacate the Property by March 1, he would be six months behind on rent.[67] Plaintiff responded, "[a]ll we want to do is buy the house."[68]

---

[62] *See* Tr. (Polk) at 37–38; *id.* (D. Polk) at 103.

[63] *See id.* (J. Motsco) at 176.

[64] *See id.*; *see also* JX 23.

[65] JX 6.

[66] *Id.*

[67] *Id.*

[68] *Id.*

On August 19, 2021, Plaintiff emailed Mr. Stewart, stating that his "sister [wa]s willing to give [Defendants] $270,000" for the Property.[69] Defendants once again rejected Donna's offer to purchase the Property.[70]

### G. Procedural History

Plaintiff initiated this action on December 10, 2021, through the filing of a Complaint for Specific Performance.[71] Plaintiff returned possession of the Property to Defendants on January 6, 2022.[72]

On October 11, 2022, Vice Chancellor Glasscock, to whom this action previously was assigned, denied Defendants' motion to dismiss the action.[73] Defendants asserted counterclaims for nonpayment of rent, breach of contract, and unjust enrichment.[74] On April 8, 2024, the action was reassigned to me, and on April

---

[69] JX 10.

[70] *Id.*

[71] Dkt. 1.

[72] PTS § 3, ¶ 6. On March 9, 2021, the Stewarts initiated an action for summary possession in the Justice of the Peace Court. *See* JX 24, *Stewart v. Polk*, JP17-21-001033 (Del. J.P. Sept. 14, 2021). The court found that "[Polk] failed to complete those transactions to close the conditional sales agreement. [The Stewarts] gave [Polk] extra time to complete those obligations. [Polk] did not do so, but proposed an alternative, which was rejected." The court further held that the parties' "relationship [wa]s now most certainly one of landlord and tenant[,]" and dismissed the summary possession action.

[73] Dkt. 19.

[74] Defs.' Answer to Pl.'s Compl. for Specific Performance 11–20, Dkt. 21.

10, I denied Defendants' motion for summary judgment because the motion implicated fact questions that would be resolved most efficiently after trial.[75]

The Court held a one-day trial on July 9, 2024.[76] Post-trial briefing concluded on December 20, 2024.[77]

## II.   ANALYSIS

### A.   Plaintiff Is Not Entitled To An Award Of Specific Performance.

Through this action, Plaintiff seeks an order specifically enforcing the Installment Contract and requiring Defendants to sell the Property to Plaintiff. "Specific performance for the transfer of real property is an extraordinary remedy and [Delaware courts] will not award it lightly." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (first citing *Szambelak v. Tsipouras*, 2007 WL 4179315, at *1 (Del. Ch. Nov. 19, 2007); and then citing *Morabito v. Harris*, 2002 WL 550117, at *1 (Del. Ch. Mar. 26, 2002)). "A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform,

---

[75] Dkts. 45–46.

[76] Dkt. 53.

[77] *See* Pl.'s Op. Post-Trial Br. [hereinafter POB], Dkt. 60; Defs.' Post-Trial Answering Br. [hereinafter DAB], Dkt. 62; Pl.'s Post-Trial Reply Br. [hereinafter PRB], Dkt. 63.

15

and (3) that the balance of equities tips in favor of the party seeking performance." *Id.* (footnotes omitted) (first citing *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007); then citing *Deene v. Peterman*, 2007 WL 2162570, at *5 (Del. Ch. July 12, 2007); then citing *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *12 (Del .Ch. Nov. 2, 2007); and then citing *Morabito*, 2002 WL 550117, at *2).

The parties dispute who repudiated the Installment Contract first. According to Plaintiff, Defendants repudiated the contract on December 28, 2020,[78] when Mr. Stewart informed Plaintiff via text that the parties no longer "ha[d] an agreement to sell the house to" Plaintiff.[79] Plaintiff contends that Defendants' repudiation "caused [him] to suspend his anticipated performance"[80] because at that point, he "had no practical choice but to stop all financing efforts."[81]

In fact, it was not Defendants, but Plaintiff, who first repudiated the contract. "[A] statement by a party that it cannot or will not perform in accordance with the parties' agreement operates as a repudiation." 13 *Williston on Contracts* § 39:40 (4th ed.), Westlaw (database updated May 2024). Plaintiff repudiated the

---

[78] POB at 8.

[79] JX 6.

[80] POB at 9.

[81] *Id.* at 14.

Installment Contract on December 5, 2020, when he informed the Motscos "point-blank" that he had "no intention" of settling on the Property, and instead discussed the date Plaintiff would vacate the Property. And on December 26, 2020, on a phone call with Mr. Stewart, Plaintiff reiterated that he did not intend to settle on the Property by December 31, 2020.

Plaintiff attempted to retract his repudiation on December 28, when he texted Mr. Stewart that he had "just left from the mortgage company" and thought he would "be approved." But a repudiating party may retract his repudiation only if "the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final." Restatement (Second) of Contracts § 256(1) (Am. Law Inst. 1981). The record strongly suggests that Defendants treated Plaintiff's repudiation as final and communicated that to him as the parties negotiated the terms under which Plaintiff would vacate the Property.[82]

But even if Plaintiff had effectively retracted his repudiation, his claim for specific performance fails for another reason. Assuming it was not Plaintiff, but Defendants, who repudiated the contract on December 28, the record makes clear

---

[82] *See, e.g.*, JX 4 ("Moveout" Agreement dated December 16, 2020).

that Plaintiff would not have had the financing to close either by the December 31, 2020 closing date or within 120 days thereafter.[83]

> [W]hen a seller's repudiation [i]s claimed to have excused the buyer from performing the condition precedent of acquiring agreed upon financing, it [i]s not necessary for the buyer to prove, as part of its cause of action for specific performance, that it would have satisfied the condition precedent prior to closing since that proof may not be available, especially if the seller's breach caused the buyer to forgo further efforts to obtain financing or caused the lender to cease its activity; rather, *the burden of proof is on the seller to establish that, regardless of the improper repudiation, the condition precedent of providing the required financing would not have been satisfied*.

13 Williston on Contracts § 39:41 (4th ed.) (emphasis added).

At trial, Defendants carried their burden to prove that regardless of any repudiation, Plaintiff could not have obtained the necessary financing to close on the

---

[83] Title 25, Section 314(d)(2) of the Delaware Code states that "parties may agree, under the contract of sale to not engage in a final settlement until fulfillment of a condition of paying the last installment of the purchase price under a conditional sale, provided that the conditional sales agreement includes provisions indicating: . . . (2) In the event of buyer or buyers default for failure to pay, the buyer or buyers have a right to redeem the property by making full payment of the remaining contract amount within 120 days of the seller or sellers providing written notice of the default . . . ." 25 *Del. C.* § 314(d)(2). According to Plaintiff, under Section 314, Plaintiff was entitled to an additional 120 days beyond December 31, 2020 to close on the Property. This argument ignores that Defendants had already extended Plaintiff's payment of the remaining principal balance for *six months*, a period greater than 120 days, and in return, Plaintiff expressly agreed that he would "settle or vacate [the Property] by December 31, 2020." JX 3.

sale. Plaintiff admitted he did not have the funds to purchase the Property.[84] Plaintiff repeatedly pursued, but was denied, financing; by December 5, 2020, he had accepted that he would not be able to obtain a mortgage to purchase the Property himself.[85] Although Plaintiff told Mr. Stewart on December 28 that he thought he had found a lender, that was not true.[86] Instead, *Donna* had applied for a mortgage to purchase the Property[87]—but she was not a party to the Installment Contract, and Defendants had already declined to sell the Property to Donna.[88] Eight months later, well after any 120-day cure period, Plaintiff told Defendants that Donna "[wa]s willing to give [Defendants] $270,000" for the Property, but plainly still did not have the funds to purchase it himself.[89]

---

[84] *See* Tr. (Polk) at 47–48 (Plaintiff testifying that he was not able to obtain financing "from a conventional bank" by December 31, 2020); *see also* POB at 17 ("[Plaintiff] did not have the means to withdraw $260,000 from his bank account. . . . [Plaintiff] needed lender support to make this purchase.").

[85] *See* Tr. (J. Motsco) at 170; *see also id.* (Jeffrey Motsco) at 191 ("During that phone call we had asked if he had any intention to settle or the ability to settle. And he said, no, I do not have any ability or intention to settle—by the December 31st deadline, that is.").

[86] In fact, Plaintiff was not approved for a mortgage until September 25, 2023, nearly three years after the amended closing date and almost two and a half years after the expiration of the 120-day cure period. *See* JX 12 (approval letter from Evolve Bank & Trust Mortgage dated September 25, 2023).

[87] JX 11.

[88] *See* JX 6 ("If I would have know[n] about buyer I would have told you that [for] anyone other th[a]n you[,] the price is $279,000.").

[89] JX 10.

Because the record makes clear that Plaintiff did not have, and could not have obtained, the financing necessary to purchase the Property by the closing date or within any cure period thereafter, Plaintiff's claim for specific performance must be denied.

Because Plaintiff was not (and, even in the absence of any repudiation by Defendants, would not have been) ready, willing, and able to perform, the Court does not need to definitively resolve whether the balance of equities tips in Plaintiff's favor. But it bears noting that the equities here tend to (strongly) favor Defendants. During the first three years of the Installment Contract, at least a third of Plaintiff's thirty-six monthly payments were short, and all were late.[90] Plaintiff took advantage of the kindness of an elderly couple who urgently needed to sell their property due to health issues, but who were willing to accommodate Plaintiff despite his repeated breaches because they believed he was a "good[,] honest person"[91] trying to stay in a house that had become his home. They did not know that he no longer lived at the Property, began subleasing it without Defendants' consent, and was accepting rent from third parties while failing to make timely installment payments or pay property taxes or liability insurance as required by the Installment Contract. Even while

---

[90] *See* JX 15; JX 16.

[91] *See* JX 6.

Plaintiff claimed that "[a]ll [h]e want[ed] to do [wa]s buy the house[,]" he never paid another installment payment after November 2020, despite retaining the Property until January 2022. The equities of this case do not support an order of specific performance, even if the other elements of specific performance were met (and they are not).

Plaintiff's request for an order of specific performance is, therefore, denied.

## B. Defendants Are Entitled To Damages.

At trial, Defendants established that they are entitled to damages under the Installment Contract as follows.

Under the Installment Contract, during the sixty-six-month period from July 2015 through December 2020:

- Plaintiff owed Defendants $1,900.00 per month, totaling $125,400.00.[92]

- Plaintiff owed Defendants a $50.00 late fee for all sixty-six months, totaling $3,300.00.[93]

- Plaintiff owed Defendants $6,565.63 in property taxes.[94]

---

[92] JX 1 ¶ 2; JX 15; JX 16.

[93] *See* JX 1 ¶ 11; JX 16.

[94] *See* JX 1 ¶ 7; JX 16; JX 19; JX 20; DAB at 43.

- Plaintiff owed Defendants $3,600.00 for insurance and homeowners' association dues.[95]

- Plaintiff paid Defendants a total of $123,420.16, resulting in a balance of **$15,445.47** that Plaintiff owed to Defendants.[96]

After the Installment Contract was terminated, Plaintiff retained possession of the Property for an additional twelve months and six days, from January 2021 through January 6, 2022. For that period:

- Plaintiff owed Defendants $1,425.00 per month in rent, totaling $17,385.00.[97]

- Plaintiff owed Defendants a $50.00 late fee for thirteen months, totaling $650.00, and resulting in an additional balance of **$18,035.00** that Plaintiff owed to Defendants.[98]

The Installment Contract provides that if Plaintiff fails to redeem the Property, "any amounts remaining in excess of that allowable by 25 *Del. C.* § 5514 shall be paid to [Plaintiff]."[99] Under that provision, Plaintiff is entitled to a $475.00 per

---

[95] *Id.*

[96] JX 1 ¶ 2; JX 2; JX 15; JX 16.

[97] JX 1 ¶¶ 4–5, 12; JX 15; JX 16; JX 24.

[98] *See* PTS § 3, ¶ 7.

[99] JX 1 ¶ 5.

month credit for the difference between the $1,900.00 sale value and $1,425.00 rental value for sixty-six months, resulting in a total credit of **$31,350.00**.

With the $31,350.00 credit subtracted from the $33,480.47 that Plaintiff owed to Defendants, Defendants are entitled to an award of **$2,130.47**.[100]

## III.  CONCLUSION

For the reasons set forth above, Plaintiff's claim for specific performance is denied.  Judgment is entered in Defendants' favor in the amount of $2,130.47.  The parties are directed to submit an implementing order.

---

[100] Plaintiff's reply brief does not engage with Defendants' damages calculation; instead, it simply suggests that "Defendant[s] have proven their calculations unreliable."  PRB at 15.  Plaintiff arguably has waived any specific objection to Defendants' calculation of damages.